THE FAJARDO SUGAR GROWERS ASSOCIATION, representada por sus *Trustees* JAMES BLISS COOMBS, JAMES H. POST y LORENZO D. ARMSTRONG, demandante y apelante, *v.* WILLIAM P. KRAMER, JEFE DEL SERVICIO FORESTAL INSULAR, VALERIANO FLORES, GUARDA BOSQUES y ANTONIO GONZÁLEZ, demandados y apelados.

No. 4531.—*Sometido:* Mayo 10, 1932. *Resuelto:* Julio 14, 1933.

*Jaime Sifre Jr., Diego O. Marrero* y *H. Franceschi,* abogados de la apelante; *Hon. Procurador General Charles E. Winter (James R. Beverley* en el alegato) y *A. Ortiz Toro, Procurador General Auxiliar,* abogados de los apelados Kramer y Flores; *Arturo Aponte,* abogado del apelado González.

EL JUEZ PRESIDENTE SEÑOR DEL TORO, emitió la opinión del tribunal.

Este es un pleito sobre *injunction* iniciado por The Fajardo Sugar Growers Association, una sociedad no incorporada, organizada de acuerdo con las leyes del Estado de Nueva York, con oficina principal en Fajardo, Puerto Rico, contra William P. Kramer y Valeriano Flores, Jefe del Servicio Forestal Insular el primero y Guarda Bosques del mismo el segundo, y contra Antonio González, vecino de Naguabo, P. R.

En la demanda se alega que la demandante es dueña de una finca conocida por "La Esperanza" radicada en el barrio

de Daguao, término municipal de Naguabo, compuesta de dos parcelas, una, A, de cuatrocientas cincuenta cuerdas que colinda al Oeste con el río Quebrada Palmas y otra, B, de cuatrocientas cincuenta y nueve, que colinda por el Oeste también con el río Quebrada Palmas y por el Sur con don Pablo Sandoz y el mar.

Que la demandante adquirió dichas parcelas en 1909, estando sus títulos inscritos en el Registro de la Propiedad, y viene desde entonces en posesión de las mismas dentro de sus linderos sin limitación alguna.

Que los demandados Kramer y Flores por sí y por sus agentes penetraron violentamente con anterioridad a la interposición de la demanda y amenazan continuar penetrando en la "Esperanza," especialmente en la parcela B, y han cortado montes y leña y autorizado a otras personas que lo hagan, sin título ni autoridad para ello, y que en los actuales momentos el otro demandado González tiene en la finca un número de peones cortando leña y realizando actos torticeros.

Que la intervención violenta de Kramer en la propiedad de la demandante no se limita a los actos indicados sí que se extiende a impedir que la demandante goce de la libre disposición de su propicdad, habiendo denunciado en varias ocasiones a empleados de la demandante por haber penetrado en dicha propiedad a realizar trabajos necesarios y actos de dominio.

El mismo día en que la demanda fué archivada la demandante pidió "un auto preliminar de *injunction,* un *restraining order* y una orden para mostrar causa." Mediante una fianza de mil dólares se ordenó a los demandados que se abstuvieran de penetrar en la finca de la demandante y de impedirle el libre disfrute de la misma, debiendo comparecer a mostrar causa por la cual no deba expedirse el auto preliminar de *injunction* solicitado.

Los demandados Kramer y Flores comparecieron por medio del Procurador General de Puerto Rico y contestaron la orden para mostrar causa y la demanda, alegando en re-

sumen que la demandante es realmente dueña de la "Espe-
ranza" con excepción de una parcela de manglares que El
Pueblo de Puerto Rico tiene dentro de la descripción que se
da en la demanda a la parcela B, siendo la superficie y límites
de dichos manglares los que siguen:

"Parcela de manglares ubicada en el barrio 'Daguao' de Na-
guabo, compuesta de 91 cuerdas y sesenta y cuatro centésimas. Co-
linda por el Norte con terrenos de la Hacienda Esperanza; Sur, el
mar, Este, Francisco Meléndez y Oeste, la Quebrada Palmas."

Aceptan los demandados que la finca de la demandante
está inscrita en el registro, pero alegan que del propio regis-
tro aparece que se formó de agrupaciones, una de las cuales
era la parcela de manglares descrita que aparece adquirida
por el primitivo causante de la demandante Guillermo Noble
a título de concesión real sujeta a ciertas condiciones de
cultivo que, no cumplidas, hicieron que la propiedad revir-
tiera al Reino de España pasando luego al Pueblo de Puerto
Rico que la posee y disfruta como parte del Servicio Forestal
de la Isla.

Niegan que la demandante esté en posesión de la totalidad
de la parcela B, ni que hubieran estado en dicha posesión
con anterioridad a la interposición de la demanda, y niegan
que hayan penetrado en porción alguna de la parcela A, acep-
tando que han penetrado en aquella parte de la parcela B
comprendida dentro de la finca del Pueblo de Puerto Rico
anteriormente descrita. Siguen negando específicamente los
otros hechos de la demanda.

Como materia nueva alegaron:

"1.—Que El Pueblo de Puerto Rico es dueño de la siguiente finca:
" 'Parcela de manglar radicado en el barrio "Daguao" del tér-
mino municipal de Naguabo; consta de 69 hectáreas, 24 áreas, 99
centiáreas, equivalentes a 176 cuerdas, 19 céntimos de otra, colin-
dante por el Norte, con terrenos de la Hacienda Esperanza, propie-
dad de la Fajardo Sugar Co.; por el Sur, con el mar; por el Este,
con los referidos terrenos de la hacienda Esperanza propiedad de
la Fajardo Sugar Co. y otros de la sucesión de Juan Cruz; y por

el Oeste, con terrenos de los señores Behn Bros., separados por la quebrada Palmas.'

"Esta finca se forma como agrupación de la finca descrita anteriormente en esta contestación y resto de manglares ubicados en la misma jurisdicción y ambas parcelas así constituídas se denominan y conocen indistintamente con los nombres de Oriente y Esperanza.

"2.—Que la parcela descrita en primer término en esta contestación la cual se agrupó a otros terrenos para formar la finca descrita bajo la letra B en el hecho tercero de la demanda fué cedida por el Gobierno de España a don Guillermo Noble y Látimer en el año 1869 con la condición de que dicho cesionario en el transcurso de un año a partir de aquella fecha cultivase la décima parte del predio; en el de cuatro años la cuarta y en el de 10 años la mitad, sin que dicho adquirente cumpliese dicha condición por cuyo motivo el título revirtió a la Corona de España; y en el año 1879 don César de Guillerna, ingeniero de montes del Reino tomó posesión de dicha parcela a nombre de la Corona, desde cuya fecha la Soberanía ha estado en posesión continua de la misma.

"3.—Que la demandante en todas ocasiones ha reconocido y especialmente desde el año 1919 hasta una fecha reciente que El Pueblo de Puerto Rico es dueño sin limitación alguna de la parcela de terreno descrita últimamente conocida indistintamente con los nombres de Oriente y Esperanza, y ha inducido a todo el mundo a creer en este estado de hecho, obrando y actuando la demandante y los demandados en esa creencia."

Y como defensas especiales se adujeron las siguientes:

"1.—Que la parte realmente interesada en este caso es El Pueblo de Puerto Rico y éste no ha prestado su consentimiento en forma alguna para ser demandado.

"2.—Que los actos verificados por los demandados Kramer y Flores están dentro de la autoridad conferídales por la ley y están llevados a efecto dentro de las atribuciones de los cargos de Jefe del Servicio Forestal y Guarda-Bosque, respectivamente, siendo el otro demandado Antonio González un simple comprador de leña y maderas de la parcela descrita últimamente, por cuyos productos paga y ha pagado dicho señor González al Pueblo de Puerto Rico el precio fijado por el Gobierno como importe de dichos productos.

"3.—Que esta corte carece de jurisdicción para decretar un injunction en este caso porque la demandante en ningún momento ha dirimido ante ninguna corte de justicia el conflicto de títulos exis-

tentes desde que revirtió el terreno concedido a don Guillermo Roble, causante de la demandante.

"4.—Que la demandante no ha sido diligente en el ejercicio de sus derechos permitiendo que el Pueblo de Puerto Rico desde tiempo inmemorial poseyese y disfrutase la heredad e incurriese en grandes erogaciones al verificar deslindes, cultivos científicos, conservaciones y explotaciones en relación con dicha heredad de El Pueblo de Puerto Rico, manteniendo además varios empleados y funcionarios que vigilen diariamente estos terrenos.

"5.—Que la ocupación y disfrute de El Pueblo de Puerto Rico de la propiedad descrita últimamente no ocasiona detrimento alguno a la demandante."

El otro demandado González contestó separadamente así:

"1.—Del hecho sexto de la demanda, niega el demandado haber realizado acto alguno en relación con ninguna de las fincas descritas en la demanda, y niega haber efectuado ningún acto perjudicial a la demandante.

"2.—Como defensa especial y distinta, alega este demandado, que él durante los últimos cuatro años ha estado dedicándose, entre otras cosas, a la compra de leña y madera de los manglares de El Pueblo de Puerto Rico, y especialmente de los procedentes de la finca Esperanza que, según información y creencia, forma parte de la finca descrita bajo la letra B en la demanda. Y alega el demandado, que todas sus actuaciones las ha llevado a cabo mediante convenio con El Pueblo de Puerto Rico, por conducto de los funcionarios y empleados de éste, habiendo siempre conducido sus pasos con la intervención y supervisión del Gobierno Insular.

"3.—Que el demandado tiene concertada la compra de cuatro mil toneladas de leña procedentes de la finca Esperanza, para ser entregadas durante el mes de diciembre y enero de mil novecientos veinte y seis y veinte y siete, habiendo obtenido previamente el permiso al efecto del Pueblo de Puerto Rico. Y alega el demandado, que no ha podido cumplir este contrato por motivo del injunction que ha sido presentado en este caso, teniendo en la actualidad sus vías abandonadas y todos los trabajos paralizados, lo que le causa irreparables pérdidas."

Se practicó una larga prueba testifical y documental por ambas partes y la corte de distrito rehusó finalmente la ex-

pedición del auto preliminar de *injunction* solicitado. En su opinión se expresó, en parte, como sigue:

"Tanto las alegaciones que hemos relatado sucintamente, cuanto la prueba presentada demuestran que existe entre las partes un verdadero conflicto de títulos de propiedad así como una controversia en cuanto al hecho de la posesión, siendo además dudoso el derecho de la demandante a ejercitar su acción no tan sólo por su negligencia en haberlo reclamado, si que también por el hecho de ser parte interesada El Pueblo de Puerto Rico y en tal condición y no pudiendo entrar la Corte a considerar tales cuestiones en este procedimiento preliminar que equivaldría a resolver la cuestión en su fondo, creemos que no procede el *injunction* preliminar solicitado más aún si atendemos a la doctrina de nuestra Corte Suprema consignada en Boudens et al. vs. Körber, et al., 18 D. P. R. 259 en que se dice lo siguiente:

"'Antes de terminar esta opinión queremos consignar que, aunque el entredicho no tiene más vida que los pocos días que generalmente transcurren hasta que la corte después de oír las razones que exponga la parte demandada resuelva decretar o no el *injunction* preliminar o definitivo, según sean los casos, sin embargo, tales entredichos deben decretarse por las cortes con gran cautela y por consiguiente no parece propio que se decreten en aquellos casos en los cuales los actos que se trata de impedir o de prohibir han venido realizándose por bastante tiempo antes.'

"Doctrina que entendemos aplicable al presente caso en que al conceder el *injunction* preliminar no haríamos otra cosa que sostener el entredicho decretado hasta la resolución final del caso por sus méritos.

"Procede pues declarar sin lugar el *injunction* preliminar solicitado disolviendo a la vez el entredicho decretado . . ."

No conforme la demandante interpuso el presente recurso de apelación. Señala en su alegato cinco errores cometidos a su juicio por la corte de distrito, 1, al resolver que existe un verdadero conflicto de títulos de propiedad entre las partes; 2, al decidir que el derecho de la demandante al remedio que solicita en esta acción es dudoso; 3, al resolver que por el hecho de ser el Pueblo de Puerto Rico parte interesada, no procedía decretar el *injunction* preliminar; 4, al decidir que no procedía considerar las cuestiones planteadas

en el *injunction* preliminar, porque ello equivaldría a resolver la cuestión en su fondo, y 5, al no declarar que lá ley y los hechos estaban en favor de la demandante concediéndole el remedio solicitado. Consideraremos primero el cuarto y luego conjuntamente todos los demás errores.

■ En realidad de verdad la Corte sentenciadora penetró en el fondo del asunto y lo decidió por sus méritos. La propia apelante así lo reconoce en su alegato. Al consignar lo que aparece al final de su opinión su intención sin duda fué la de atenuar el alcance de sus anteriores conclusiones dando a entender que su mente y su conciencia quedaban abiertas a cualquier demostración ulterior en contrario.

Convenimos en que las cortes de jurisdicción original deben proceder con gran cautela en estos casos, pero si la cuestión a resolver surge clara de las alegaciones y las pruebas, deben decidirla, cualquiera que sea el efecto que tenga su resolución en el litigio.

■■ Despejada así la situación, penetremos de lleno en las cuestiones envueltas en el procedimiento. Las alegaciones son completas, fué amplia la prueba y los alegatos archivados ante este tribunal han sido preparados cuidadosamente. No se trata aquí de un *injunction* para recobrar la posesión establecido de acuerdo con la Ley No. 43 de 1913 (pág. 85), según quedó enmendada por la Ley No. 11 de 1917 ((2) pág. 222), sino del clásico que autoriza la ley sobre la materia aprobada el 8 de marzo de 1906, Comp. 1911, Secciones 1354 y 1363, pág. 292 y siguientes.

Sabemos que la demandante alegó que es la dueña con su título inscrito de la parcela de que trata y que está en posesión de la misma. Y ahora diremos que sostiene en su alegato que no sólo alegó si que probó tales alegaciones.

Y sabemos también que los demandados reconocieron que la demandante era dueña de la hacienda "Esperanza" con excepción de la parcela de manglares realmente en disputa que se concedió al primitivo dueño de la hacienda sujeta a determinadas condiciones que no se cumplieron, a consecuen-

cia de lo cual volvió a poder de la Corona de España, pasando luego al del Pueblo de Puerto Rico que se encuentra actualmente en posesión de la misma.

Si los demandados pudieron contestar en la forma en que lo hicieron y suscitar las defensas que en su contestación levantaron, no hay duda alguna que se plantea por las alegaciones una verdadera controversia sobre títulos de propiedad y sobre el hecho de la posesión, y habrá que examinar la prueba practicada para resolverla en justicia.

Discutiendo el primer error que señala, dice la apelante en su alegato:

"Si esta Hon. Corte examina cuidadosamente el récord, y especialmente la demanda y la contestación de los demandados William P. Kramer y Valeriano Flores, encontrará que no hay en este caso nada que pueda inducir a creer que El Pueblo de Puerto Rico sea parte demandada necesaria en este procedimiento. Si bien es verdad que los demandados antes mencionados han comparecido y han alegado que la finca en donde se cometen las intromisiones es propiedad de El Pueblo de Puerto Rico y que éste tiene título sobre dicha finca, no es menos cierto que El Pueblo de Puerto Rico no ha comparecido a hacer alegación alguna ni ha solicitado intervención en el procedimiento y, por tanto, es de estricta aplicación lo resuelto por esta Hon. Corte en el caso de Central Victoria vs. Kramer, 35 D. P. R. 183.''

Y luego, al discutir su tercer señalamiento de error, agrega:

"Ya hemos dicho anteriormente que éste es un procedimiento entablado por la demandante contra Kramer, Flores y González en su carácter personal, para prevenir la comisión de actos torticeros efectuados por los mismos en perjuicio de la demandante y en violación de los derechos de propiedad de la misma.

"El *injunction* como todos los procedimientos de equidad, es un procedimiento *in personam*, y en este caso va dirigido exclusivamente contra los demandados antes mencionados; para nada se menciona al Pueblo de Puerto Rico en la demanda, y no vemos que en un caso como éste, en que se trata de impedir la comisión de actos torticeros realizados por personas que se llaman agentes del gobierno, tal hecho, o sea la descripción que se hace de la persona (*descriptio*

*personae*), pueda convertir la acción en una en que El Pueblo de Puerto Rico sea parte necesaria.''

Y cita en apoyo de sus conclusiones la apelante los casos de *Osborn* v. *Bank of United States,* 6 Law. Ed. 204, y *United States* v. *Lee,* 27 Law. Ed. 171, resueltos por la Corte Suprema de los Estados Unidos.

Veamos en primer término si el caso de Central Victoria, supra, aplicado a los hechos de éste, tiene el alcance que pretende la apelante.

Dicen los apelados en su alegato:

''Nosotros no hemos alegado en ningún momento que El Pueblo de Puerto Rico es parte necesaria como demandada en este caso, por la sencillísima razón de que El Pueblo de Puerto Rico no podía ser demandado (sin su consentimiento). Lo que sí alegamos nosotros es que la parte realmente interesada en este caso es El Pueblo de Puerto Rico, como base para nuestra alegación de que los actos de los demandados Kramer y Flores eran actos oficiales y no actos en su carácter particular; y, además, para sostener nuestra defensa de que los actos de estos funcionarios no eran violentos, sino actos llevados a efecto en virtud de autoridad conferida por la ley y por el cargo que desempeñaban.''

Y para sostener que en éste la cuestión fué planteada de modo distinto a como se suscitó en el caso de Central Victoria, supra, siguen diciendo:

''En aquel caso se hizo una comparecencia especial, algo así como una excepción previa a la demanda, a base de que los demandados eran funcionarios públicos. Claro está, que si los demandados actuaban torticeramente, sus actos eran *ultra vires* y no obligaban a la Soberanía y eran responsables personalmente de los mismos. Pero, sin embargo, en el caso de autos nosotros establecimos una contienda negando el título en la demandante; negando la posesión en la demandante; invocando el interés en El Pueblo de Puerto Rico; demostrando que los actos de los demandados Kramer y Flores eran consecuencia necesaria de sus deberes oficiales; demostrando el título de El Pueblo de Puerto Rico; la posesión desde tiempo inmemorial de El Pueblo de Puerto Rico; invocando y sosteniendo la defensa de 'laches' y de 'estoppel'. Y detrás de nuestros 'pleadings' tuvimos una prueba robusta y contundente.''

A nuestro juicio ambos casos pueden distinguirse. Exponiendo la regla a aplicar dijo esta corte por medio de su Juez Asociado Sr. Wolf en el de Central Victoria, supra:

"Hay dos clases de decisiones. Una de ellas en su esencia sostiene que cuando un demandado está actuando realmente en su capacidad representativa como agente del Gobierno, sus actos han de ser considerados como los actos del Gobierno. In re Ayers et al., 123 U. S. 443; Minnesota v. Hitchcock, 185 U. S. 373. La otra clase de decisión es que cuando un agente actúa torticeramente él no puede defenderse escudándose en su supuesta autoridad oficial. Hopkins v. Clemson College, 221 U. S. 636 (55 L. Ed. 890), y casos, Louisville & Nashville R. R. Co. v. Burr, 44 L. R. A. (N. S.) 189."

Si bien en este caso se alegó que los demandados penetraron en las tierras en cuestión violentamente, alegación que lo coloca en la línea de casos puramente personales, es lo cierto que en la contestación se levantan hechos que de ser ciertos lo colocarían en la línea de casos en que las cortes se convencen de que no es la persona prevaliéndose de su cargo la que actúa invadiendo el derecho de los ciudadanos, sino El Pueblo mismo el que interviene por medio de sus funcionarios y en el ejercicio de sus atribuciones y el cumplimiento de sus deberes.

Parece lo verdaderamente justo que no se prive al ciudadano de reclamar ante las cortes su derecho lesiondo por los funcionarios públicos, permitiendo a éstos escudarse en el privilegio que se reconoce al Pueblo de no poder ser demandado sin su consentimiento, pero parece también lo justo que no se aplique la regla de tal modo que el privilegio quede anulado por completo, obligando al Pueblo a comparecer y a someterse en cualquier caso a la jurisdicción de las cortes. Resolver otra cosa sería revocar la jurisprudencia establecida por la Corte Suprema de los Estados Unidos en el caso de *El Pueblo* v. *Rosaly,* 227 U. S. 270.

Procederemos ahora al estudio de los casos decididos por la Corte Suprema de los Estados Unidos que invoca la apelante. Es el primero el de *Osborn* v. *United States Bank,*

22 U. S. 737. La opinión de la corte fué emitida por el Juez Presidente Sr. Marshall, disintiendo el Juez Sr. Johnson. Entre otros principios dejó establecidos, tomándolos del resumen, los que siguen:

"En general, no se expedirá un *injunction* ni se dictará un decreto contra un agente cuando el principal no es parte en el litigio; mas si el principal mismo no está sujeto a la jurisdicción de la corte (como cuando se trata de un Estado extranjero), puede hacerse caso omiso de la regla.

"Una corte de equidad expedirá un *injunction* para impedir el traspaso de una cosa específica que de ser traspasada causará daños irreparables a su dueño, como garantías negociables y acciones.

"Las cortes de circuito de los Estados Unidos tienen jurisdicción en un procedimiento instituído por el Banco de los Estados Unidos con el propósito de proteger el banco en el ejercicio de sus franquicias, cuya invasión es inminente, de conformidad con las leyes constitucionales del Estado; y como de acuerdo con la enmienda undécima de la Constitución no se puede hacer parte demandada al estado, el litigio podría presentarse contra los funcionarios y agentes del estado, que están investidos de la obligación de hacer cumplir tales leyes.

"Un estado no puede imponer contribuciones al Banco de los Estados Unidos; y cualquier tentativa de parte de sus agentes y funcionarios para exigir tales contribuciones contra los bienes del banco, puede ser impedida mediante *injunction* expedido por la corte de circuito."

En el curso de la opinión, página 842, el Juez Presidente, hablando por la mayoría de la corte, se expresó como sigue:

"Si se hubiese podido hacer parte demandada al Estado de Ohio, difícilmente podría negarse que éste sería un caso fuerte de *injunction*. La objeción es que como no se puede traer ante la corte la parte realmente envuelta, no se puede sostener un litigio contra los agentes de esa parte; y se han citado casos para demostrar que una corte de equidad no dictará un decreto a menos que todas aquellas partes que estén substancialmente interesadas figuren como partes en el litigio. Esto es realmente cierto cuando el agente tiene el poder para hacerlo así; mas si la persona que es el verdadero principal, la persona que es la verdadera fuente del daño, mediante cuya facultad y en cuyo beneficio el hecho se realiza, se halla fuera de

la jurisdicción de la ley, si está exenta de todo proceso judicial, sería subversivo de los mejores principios establecidos decir que la ley no podría ofrecer los mismos remedios contra el agente empleado para realizar el daño causado que los que ofrecería contra el principal de podérsele hacer parte en el litigio. Se admite que el privilegio de que goza el principal no se transmite al agente dado el conocimiento que tienen los apelantes de que procedería en derecho un recurso contra el agente, en que puede concederse plena indemnización por el daño causado. Habiéndose admitido entonces que el agente no goza de privilegio por sus relaciones con el principal, que es responsable de sus propios actos, hasta el límite de los daños causados, ¿por qué el poder preventivo de una corte no puede también hacérsele extensivo? ¿Por qué no puede impedirle la comisión de un perjuicio por el cual podría castigarle? Estamos haciendo caso omiso de la naturaleza del principal como Estado soberano porque ésa es cuestión distinta y estamos considerando la cuestión simplemente en lo que respecta a la indebida acumulación de partes. Ahora bien, si la parte que está ante la corte es responsable de todos los daños, ¿por qué no puede impedírsele su comisión si no puede traerse ante la corte a ninguna otra parte?''

Se trataba de un caso en el que estaba envuelta una cuestión—la anticonstitucionalidad de una ley—que constituía en sí misma una excepción. En tal caso las actuaciones del funcionario siendo *ultra vires* no pueden considerarse como actuaciones de la soberanía. Y ello puede determinarse sin necesidad de demandar al soberano, juzgando exclusivamente los actos del que llamándose su agente en realidad de verdad no lo es.

El otro caso invocado es el de *United States* v. *Lee,* 106 U. S. 196. La opinión fué escrita por el Juez Sr. Miller, disintiendo el Juez Presidente Sr. Waite y los Jueces Sres. Bradley, Wood y Gray. La opinión de la disidencia fué escrita por el Juez Sr. Gray. Los principios que quedaron establecidos en el mismo, tomándolos del resumen, fueron:

''La doctrina de que a menos que el Congreso lo haya provisto no se puede demandar a los Estados Unidos de América, es examinada y ratificada en este caso.

''Esa doctrina no es aplicable a funcionarios y agentes de los

Estados Unidos, que, cuando como tales usan bienes para fines públicos, son demandados a causa de ellos por persona que alega ser dueña o tener derecho a los mismos; mas la legalidad de esa posesión y el derecho o título de los Estados Unidos a la propiedad pueden ser objeto de investigación y resolución por una corte de jurisdicción competente.

"Las disposiciones constitucionales de que no se privará a ninguna persona de la vida, libertad o hacienda sin el debido proceso de ley, y de que no se tomarán bienes particulares para uso público sin la debida compensación, se refieren a aquellos derechos cuya protección cae especialmente dentro de la rama judicial del gobierno. Se hace un examen de casos que revelan que las cortes conceden remedio cuando los derechos de propiedad son invadidos ilegalmente por funcionarios públicos.

"En procedimiento de reivindicación el título en que se basaba el demandado era un certificado de venta de los bienes en litigio en favor de los Estados Unidos, expedido por los comisionados de conformidad con la ley del Congreso relativa al cobro de contribuciones directas. Se atacó el certificado por el fundamento de que los comisionados se habían negado a permitir al dueño que pagara las contribuciones, con intereses y costas, antes del día señalado para la subasta, valiéndose de un agente, o en otra forma que no fuera mediante el pago en persona. *Se resolvió* que una vez que los comisionados establecieron la regla uniforme de que no recibirían tales contribuciones a no ser del dueño personalmente, ello anula tal subasta y el ofrecimiento es innecesario, ya que éste de nada serviría.

"Los casos de Bennett v. Hunter, 9 Wall. 324; Tacey v. Irwin, 18 íd. 549, y Atwood v. Weems, 99 U. S. 183, son examinados nuevamente y se resolvió que los principios por ellos establecidos son aplicables a una compra hecha por los Estados Unidos o por un particular en tal subasta."

No hay duda de que esos principios favorecen en parte la contención del apelante. Decimos en parte, porque nunca se ha ido al parecer tan lejos como ella pretende en este caso. Se ha sostenido que la controversia puede decidirse penetrando en sus méritos en ausencia del Estado, juzgando los actos del funcionario, pero no que el funcionario no pueda invocar la legalidad de su actuación y si la prueba que el caso no pueda decidirse en su favor.

Prácticamente la doctrina de la Corte Suprema obliga al Estado a comparecer y a defenderse por medio de su agente. De ahí que deba restringirse a casos como el de la inconstitucionalidad de la ley a virtud de la cual actúa el funcionario o a casos como el de *United States* v. *Lee,* supra, en que era tan patente la sinrazón del Estado que la cuestión debía decidirse en definitiva en bien de la justicia. Pero cuando la defensa del funcionario revela que actúa dentro de sus legítimas facultades, resultando que es el Estado la verdadera y única parte interesada y que el derecho del Estado no es una mera pretensión si que tiene fundamento, entonces no hay invasión del derecho del ciudadano por parte del funcionario y la regla general debe aplicarse reconociéndose que el Estado no puede ser demandado sin su consentimiento, desestimándose la acción ejercitada después de haber penetrado en los méritos a los efectos de juzgar la conducta de los funcionarios.

Lo que hemos dicho implica que los demandados en este caso pudieron contestar en la forma en que lo hicieron y alegar las defensas que en su contestación formularon. ¿Las probaron?

Puede admitirse que, en cuanto al título de la parcela en cuestión, la demandante presentó un caso prima facie en su favor, pero analizando la prueba aportada por los demandados es necesario reconocer que impugna fuertemente el título de la demandante de tal manera que juzgada la controversia por sus méritos, podría quizá resolverse en su favor. En cuanto al hecho de la posesión la prueba de ambas partes resultó contradictoria.

De certificaciones expedidas por el Registrador de la Propiedad del Distrito presentadas por ambas partes consta que la primitiva hacienda ''Esperanza'' se inscribió por vez primera en el Registro de la Propiedad de Humacao, tomo correspondiente a Naguabo, el 29 de mayo de 1880, a favor de don Guillermo Noble. Se componía de 1,059 cuerdas y estaba formada de diferentes parcelas, una de ellas de 91 ''proce-

dentes de terrenos baldíos, según título expedido por el Excelentísimo Señor Presidente de la Junta Superior de terrenos baldíos el veinte y ocho de junio de mil ochocientos sesenta y nueve." Y así se fué trasmitiendo hasta llegar a la demandante en 1909.

Y de una certificación expedida por el Comisionado del Interior que presentaron los demandados y fué admitida por la corte sin oposición de la demandante, aparece:

"Que según antecedentes que obran en los archivos de este Departamento 'El Pueblo de Puerto Rico' posee por virtud de Ley del Congreso de los Estados Unidos de América, aprobada en 1 de julio de 1902, 'Autorizando ál Presidente para reservar terrenos y edificios públicos en la Isla de Puerto Rico, para usos públicos y cediendo otros terrenos y edificios públicos al Gobierno de Puerto Rico y para otros fines,' el inmueble siguiente: RÚSTICA.—Parcela de manglar, radicada en el barrio Daguao del término municipal de Naguabo; consta de 69 hectáreas, 24 áreas y 99 centiáreas, equivalentes a 176 cuerdas y 19 centésimas de otra; colinda por el Norte con terrenos de la Hacienda Esperanza propiedad de 'Fajardo Sugar Company'; por el Sur con el mar; por el Este con los referidos terrenos de la Hacienda Esperanza propiedad de 'Fajardo Sugar Company' y otros de la Sucesión de Juan Cruz; y por el Oeste con terrenos de los Señores Behn Brothers separados por la Quebrada Palmas, siendo la descripción exacta de linderos, la siguiente: (Se describe.)

"Formando parte de los manglares que se acaban de describir, se encuentra una parcela de terrenos baldíos que en 28 de junio de 1869 fué concedida por la Junta Superior de repartimiento de terrenos baldíos a Don Guillermo Noble, según título que le fué otorgado en esa fecha, el que copiado literalmente dice así:

" 'La Junta Superior de repartimiento de terrenos baldíos creada por Real Cédula de 28 de diciembre de 1818.—Por cuanto corresponde al Exmo. Sr. Presidente según la Real Orden de once de junio de mil ochocientos sesenta y tres la expedición de los títulos firmados por S. E. y refrendados por el infrascrito Secretario.—Constando del expediente respectivo y acuerdo del día diez y ocho del actual mes de junio haber sido agraciado D. Guillermo Noble vecino hacendado del Partido de Naguabo con un área de noventa y una cuerdas sesenta y cuatro centésimas de otra de terreno baldío, situado en el barrio de Daguao y sitio de la Cienagueta del mismo

Partido, en virtud de la mensura que del propio terreno se ha practicado con los requisitos prevenidos en virtud de lo acordado por la Corporación en veinte y tres de marzo del año próximo pasado, conforme aparece así del indicado expediente; siendo la referida mensura del tenor siguiente:—"El infrascrito Geómetra Agrimensor que suscribe.—Certifico: que el deslinde de terrenos entregados a D. Guillermo Noble que como baldíos existían en el barrio del Daguao y sitio de la Cienagueta, es como sigue: (Continúa la descripción por puntos, grados y distancias.)" Por tanto en nombre del poder Ejecutivo de la Nación se confiere la propiedad efectiva del expresado terreno al referido D. Guillermo Noble para su posesión y goce como verdadero dueño de él; bajo la condición indispensable de la revocación de esta gracia y reversión de aquél al Estado si en el preciso término de un año no tiene cultivada la décima parte de él, en el de cuatro años la cuarta y en el de diez la mitad a beneficio de la agricultura; y con la obligación que asimismo se le impone de que a los dos meses cuando más de la fecha de este título ha de dar principio al cultivo de los terrenos que se le conceden, en cuyo caso no podrá turbársele en su posesión ni disputársele su dominio, pues antes al contrario se le amparará y sostendrá por los jueces territoriales y demás autoridades a quienes se exhorta y requiere al efecto; debiendo pagar el agraciado los derechos de tierra. Póngasele desde luego en posesión por el juez del territorio con la oportuna toma de razón, previa la de esta Admon. Local de Rentas y Aduanas.—Dado en Puerto Rico, firmado de mi máno y refrendado por el infrascrito Escribano de Guerra Secret. de esta Junta Superior a veinte y ocho de junio de mil ochocientos sesenta y nueve.— Sanz.—Antº Mª de Aldrey—Secretº—Pto. Rico 5 julio/869—Es Copia.'

" 'Que no habiendo cumplido el concesionario Don Guillermo Noble ni sus cesionarios la condición indispensable de cultivo impuéstale en la concesión, pues la referida parcela continúa aún en su primitivo estado de manglar, ha quedado dicha concesión declarada insubsistente y revertidos los terrenos al Estado, en virtud del Artículo 3º del Reglamento para la composición de terrenos realengos en la Isla de Puerto Rico, que fué aprobado por Real Orden No. 254 de 17 de abril de 1884, publicada en la Gaceta de Puerto Rico de 13 de mayo del mismo año, cuyo Artículo 3º dice así:

" " "Artº 3º Todas las concesiones de terrenos en general y en especial las verificadas desde el año 1850 hasta la fecha en que no se hayan cumplido las condiciones impuestas, se declaran insubsistentes y revertidos los terrenos al Estado."

" 'Este artículo 3º fué reformado por Real Orden No. 469 de 20 de agosto de 1888, publicada en la Gaceta de Puerto Rico No. 122 de 11 de octubre de 1888, la que copiada literalmente dice así:

" ' "Por el Ministerio de Ultramar con fecha 20 de agosto último y bajo el número 469, se comunica a este Gobierno General la Real Orden siguiente:

" ' "Exmo. Sr.—Enterado. S. M. El Rey (q. D. g.) y en su nombre la Reina Regente del Reino, del acuerdo de la Junta Superior de Composición y venta de terrenos realengos de esa Isla, relativo a la reforma del Art. 2º del Reglamento de 17 de abril de 1884 y del 12º de la instrucción dictada para su cumplimiento que V. E. remitió en copia, con carta oficial No. 175 de 9 de mayo último; y conformándose con lo consultado por el Consejo de Estado en pleno, ha tenido a bien resolver:—1º—Que no procede modificar el Art. 2º del Reglamento ni el 12º de la Instrucción. 2º—Que el Artículo 3º del Reglamento, queda reformado en los términos siguientes:—'Las concesiones de terrenos en general, y en especial las verificadas desde el año 1850 hasta 1884 en que no se hayan cumplido las condiciones impuestas, se declaran insubsistentes y revertidos los terrenos al Estado, a no ser que los concesionarios vengan poseyéndolos desde más de 30 años, que es el plazo señalado para la prescripción en los terrenos incultos y poseídos sin título, por el Artículo anterior.'

" ' "De Real Orden lo digo a V. E. para los efectos correspondientes. Y puesto el cúmplase por su E. con fecha 9 del mes próximo pasado, de su orden superior se publica en este periódico oficial para general conocimiento.

" ' "Puerto Rico, octubre 6 de 1888.—El Secretario del Gobierno General, Fernando Fragoso".' "

La prueba testifical de la demandante consistió en las declaraciones de los Sres. McCormick, Cruz, Sabat, Kramer, Grago y Figueroa, quienes dijeron, en resumen:

McCormick, que es el jefe de cultivos de la Fajardo Sugar Growers Association que es dueña de "La Esperanza" que entre otra clase de terrenos tiene "poyales de manglares" de los que se cortan estacas y varas y en los que entran a cortar leña algunas personas por cuenta del demandado González; que siempre que veían gente cortando en ellos mandaba a impedirlo yéndose unas veces y resistiendo otras. Refiriéndose al demandado Flores: "Él es guardabosque de la

jurisdicción esa, y él va ahí a veces, en cuanto mandan gente a cortar manglares, diciendo que él tiene poder de hacerlo.'' Penetran por las orillas del mar y la quebrada Palmas. Han cortado más o menos entresacado, sobre quince cuerdas. Al presentársele una carta del abogado Sr. Sifre escrita en 1919 a nombre de la Fajardo Sugar Co. of P. R. pidiendo permiso al Comisionado de Agricultura para cortar postes en los manglares de ''Piñero, Santa Rita, Mata Redonda, Fortuna, Esperanza y Mont Ida'' que fué admitida como prueba con la objeción de la demandante, y preguntársele si tenía conocimiento de ella, contestó: ''Como he dicho ahorita, yo no sabía si se había pedido permiso por la Esperanza, pero sabía que se había pedido permiso de algunos manglares de la compañía que tenía arrendados, pero de la Esperanza no sabía que se había pedido.'' Al preguntársele: ''¿Pero esa parte donde se cortaba el mangle, era parte de esa finca Esperanza que era de William Noble o de Guillermo Noble, o no lo sabe usted?'' contestó: ''Yo nunca intervenía en esos detalles así, solamente intervine en el cuerpo, en el fondo de la finca.'' Reconoce en los demandados Kramer y Flores a empleados del Gobierno de los cuales es amigo. Ellos lo han molestado como empleados. A los manglares en que se cortaron las quince cuerdas se tiene que ir en yola por el río, o por el mar en botes. Ha sido administrador de campo por diez años. En 1920 recuerda que fué el ingeniero del gobierno Benítez y estuvo en los manglares. No recibió notificación para mensura alguna en 1923. El encargado de la oficina de la compañía es don Jorge Bird.

Cruz, mayordomo de la demandante, conoce a Flores y a González. Este ha cortado maderas en la Esperanza por orden de aquél. Le dijo que suspendiera el corte y le contestó que seguiría cortando. Flores es guardabosque del gobierno y como tal es que interviene. La leña la llevan al mar por la orilla del río. Hace algunos años que conoce a González en el negocio de leña en esos manglares. ''Del año pasado (1925) para acá es que ha tenido más movimiento . . .

ese negocio de leña.'' Lleva cinco años de mayordomo. Cuando entró cree que ya Flores era guardabosque.

Sabat, celador de la demandante, tiene órdenes de no dejar entrar a nadie en los manglares. ''Y al yo estar celando, sentí picando dentro del monte y fuí a avisar al mayordomo, y entonces él me ordenó que viniera a suspender a la gente que fuera, y yo vine, y al venir yo a suspenderlos, entonces el señor Flores me dijo que si traía una orden, y de quién era, y yo dije que del mayordomo, y entonces él me dijo que no suspendería de ninguna manera, mientras no tuviera una orden del Gobierno de la Forestal.'' Encontró a Flores en los manglares allá por el 1923. Estaba al cuidado de los peones que cortaban. El dirigía. A González no lo ha visto en los manglares. Voltea los manglares todos los días. La marea se mete en ellos.

Kramer, el demandado llamado por la demandante, es Jefe del Servicio Forestal, su trabajo consiste en la administración y supervisión de los bosques insulares, Flores es el encargado de los bosques del distrito de Ceiba, las dificultades que ha tenido con la demandante consisten ''en intromisiones de los empleados y trabajadores de la Fajardo Sugar.'' Su departamento ha dado órdenes para el corte de maderas en los manglares de Daguao, municipio de Naguabo. ''El señor Valeriano Vega estaba encargado de la supervisión del trabajo, y el señor Antonio González era el contratista, tenía un contrato para cortar.'' Las dificultades que tuvo en la explotación de los manglares en la Esperanza comenzaron en 1922. Antes de esa fecha la demandante no le había molestado.

Grago, ingeniero, se presentó para introducir la copia del plano de la finca Esperanza levantado por el agrimensor, Nin Martínez. Se admitió con la objeción de los demandados.

Figueroa, que había tenido que ver con Flores ''porque yo cortaba piquetes en Oriente y en la Esperanza, y él varias veces me ha suspendido. Pues me denunció y se celebró el

juicio en Ceiba y salí absuelto. Por cortar piquetes que la compañía me mandó."

Declararon como testigos de los demandados, Morales, McCormick, García, Kramer y Flores.

La declaración del agrimensor oficial del Departamento del Interior, Morales, es extensa y difícil de resumir. Recibió orden de deslindar los bosques y manglares de la parte oriental de la Isla en 1919. Empezó por Punta de la Lima de Naguabo, en el manglar Mount Ida, y siguió hasta la desembocadura del río Fajardo, en el manglar Santa Rita, pasando por los manglares de la Esperanza, Oriente y Mata Redonda. Midió los de la Esperanza, en 1920. Estaba en posesión de ella la Reserva Forestal por su encargado Flores. Él le enseñó sus límites. "Todos los colindantes fueron llamados y citados personalmente por él para que concurrieran al deslinde." Fué personalmente a la Central Fajardo a ver a don Jorge Bird para que le entregara copia de los planos de las propiedades y Bird le indicó que fuese donde el *comptroller* Sr. Candal quien le proporcionó los planos de varias propiedades entre ellas "La Esperanza" y le dijo que el Sr. Sifre tenía las escrituras en San Juan. Vió personalmente al Sr. Sifre quien le mostró los títulos, sacando copia de ellos. Practicó la mensura. El manglar de la Esperanza tiene 176 cuerdas, colinda por el Norte con terrenos de la Hacienda Esperanza, por el Sur con el mar, por el Oeste con la Hacienda Esperanza y la Sucesión Cruz y por el Este con un río que llaman Quebrada Palmas. Levantó un plano de la mensura. Todo es un manglar que baña la marea. Lo ayudaron Flores y tres personas de apellidos Parrilla, Vázquez y García. "Había algún malojillo que nosotros no quisimos discutir con la Central y se lo dejamos, pero que en realidad pertenece al Pueblo de Puerto Rico." Dejaron ese terreno "porque no está cubierto en su totalidad por el manglar verdadero." No fué interrumpido por los agentes de la demandante, "al contrario, algunos de ellos, uno de los mayordomos me facilitó un bote para trasladarme al Islote

Media Luna." No hubo oposición. Tuvo oportunidad de hablar con don Jorge Bird y tiene la "carta que se le envió con respecto al deslinde de ese terreno." Habló personalmente con él y con el Sr. Sifre. La carta se envió al Sr. Bird por correo y no fué devuelta. Se le muestra y reconoce el plano por él levantado. Ciertas cruces que en él aparecen son estacones que puso sobre el terreno para determinar el límite de arbustos de manglar. La parte en que existe el malojillo no aparece en el plano, está al Oeste, "fué una parte en que tumbaron el manglar, y por eso fué que nosotros se la reconocimos y se la dejamos a ellos."

Contestando al abogado de la demandante sobre los datos en que basó su mensura, dijo: "Aquí tiene usted un inventario de montes, donde yo busqué todo: aquí en la página 8 dice: relación de terrenos baldíos y montes del Estado que figuran en el archivo desde el mil ochocientos sesenta y de los cuales los tomé."

Respondiendo a la pregunta del abogado del demandado González, sobre si eso era la Esperanza, manifestó: "Sí, señor. Este, el mar, y Oeste Hacienda Oriente; la Hacienda Oriente viene a colindar con la finca Esperanza, según ha dicho el señor McCormick. Oriente de Sandon o Sandoz. Cabida aforada 23.58 h. Y aquí tiene, señor Juez, la fecha de toma de posesión: diciembre 3 de 1878, diez años después de la expedición de este título, que no cumplieron las condiciones, según aparece en el libro, el gobierno se incautó de los terrenos esos."

El plano a que venía refiriéndose el testigo quedó presentado como prueba con la objeción de la demandante.

El juicio fué suspendido para otro día y comenzó de nuevo con el Sr. Morales en la silla de testigos. Contestó al abogado de la demandante en parte, así:

"Testigo, ¿usted dijo ayer, que había hecho este plano?—Sí, señor. —¿Para hacer este plano cómo lo hizo?—Pues de acuerdo con el acta de incautación, yendo al sitio y tomando los puntos taquimétricamente.—¿De acuerdo con el acta de incautación?—Sí, señor.—¿Ésa

es el acta que se presentó ayer en evidencia?—Sí, el acta esa.—¿La del libro?—Sí, la de un libro.—¿Aquí está la descripción de esa finca —Es decir, la parte de ella, de los manglares, porque esas noventa y una cuerdas forman parte del manglar que posee El Pueblo de Puerto Rico ahí.—¿De acuerdo con este plano cuál es el área de la finca que se describe aquí?—Ciento setenta y seis cuerdas con diez y nueve centavos, ése es el área total de la masa de manglar en la Esperanza.''

Dijo que para levantar el plano tuvo en cuenta la concesión del Gobierno Español a Noble, formando la parcela concedida parte de ese manglar.

A la pregunta del abogado de la demandante: ''¿Usted dice que el Sr. Flores estaba en posesión de esa finca?'' contestó: ''Sí, señor, porque él tenía peones allí, efectuaba cortes, no fué molestado por nadie. Yo penetré allí con él, mensuramos todo el cauce de la Quebrada Palmas por dentro del mismo cauce, salimos a la Playa, dimos la vuelta, y estuvimos como dos semanas allí, y no ví a nadie de la Central, ni particulares que hicieran una intromisión allí en nada; él era el que gobernaba allí. . . . yo tenía conocimiento de que él tenía esos manglares bajo su custodia, porque yo recibí una orden de mi jefe, que me pusiera a la voz con ese señor que (era) el que tenía a su cargo los manglares.''

Mientras practicaba la mensura vió el corte de leña y la venta de la misma bajo las órdenes de Flores.

Llamado por los demandados volvió a declarar el Sr. Mc-Cormick. Ratificó su dicho de ser don Jorge Bird Arias, el que está en la Fajardo Sugar Co., el representante en Puerto Rico de la demandante Fajardo Sugar Growers Association.

Floirán García fué uno de los trabajadores que ayudó al ingeniero Morales en la mensura de los manglares en la que emplearon varios meses. Refiriéndose a los de la Esperanza dijo que estaba en posesión de ellos el guardabosque Flores, que para su mensura se abrían callejones, cortándose las ramas que estorbaban y colocándose estacas, que el terreno

mensurado era todo manglar de agua salada, bañado por la marea. Midieron muchas cuerdas empleando en ello una porción de días sin que nadie les molestara. Le pagaba el Gobierno. Vió a los empleados de la demandada y ellos lo vieron a él y nada le dijeron, ni prohibieron.

Se estipuló por las partes que los testigos Parrilla y Vázquez, que fueron los otros trabajadores que ayudaron al ingeniero Morales en la mensura declararían en el mismo sentido que García.

Volvió a declarar el demandado Kramer. Dijo que además de Jefe del Servicio Forestal Insular que corresponde al Departamento de Agricultura de la Isla, trabaja en el Servicio Forestal de los Estados Unidos. Conoce bien las colindancias del manglar Esperanza. Ha estado en él mucho tiempo. De 1921 a 1926 muchas veces. Han cortado manglares de tiempo en tiempo. El Gobierno recibe grandes beneficios de su explotación. "En el manglar de Esperanza hemos cortado durante los dos últimos años, alrededor de cinco mil toneladas, cubriendo un área de treinta a treinta y cinco cuerdas." Cortan de un modo científico. Es graduado de selvicultura. "Hemos hechos varios contratos con el señor González en la explotación del manglar Esperanza." Actualmente "tenemos un contrato con el señor González que está presente." Los manglares Esperanza son "tierra baja, cerca del mar, y usualmente cubiertos de agua. Todas las veces que yo he estado allí ha estado cubierto de agua, y he andado al través del agua."

Repreguntado por el abogado de la demandante contestó:

"¿Usted dice que el servicio forestal de Puerto Rico está en posesión del Manglar Esperanza?—Hemos estado en completa posesión del Manglar Esperanza.—¿En qué hecho descansa usted para decir que están en completa posesión del Manglar Esperanza?—Si nosotros mandamos hombres a cortar a ese manglar, recibimos beneficios de esos manglares; y en segundo lugar que denunciamos las intromisiones en esos manglares.—¿Han sido ustedes molestados en alguna ocasión en el corte de madera por alguna persona en la Esperanza?—Sí, hemos sido molestados.—¿Cómo y en qué forma?—La

Central Fajardo ha mandado hombres a molestar y a parar el trabajo que estamos efectuando en ese manglar, especialmente durante la ausencia de nuestro guardabosque.—¿Cuando usted dice Fajardo Sugar Company es la Fajardo Sugar Growers Association a quien usted se refiere?—Puede que sea, solamente conocemos la Central Fajardo.''

El demandado Valeriano Flores Vega, también declaró. Dijo que era guardabosque insular y que en su carácter oficial está en posesión de propiedades del Pueblo de Puerto Rico, todas manglares, entre ellos los de la Esperanza, desde 1919 en que se los entregó su antecesor. Nunca ha sido desposeído. Esos manglares comprenden 176 cuerdas. Los manglares crecen dentro del agua salada. El Caño Prieto está en el centro del manglar la Esperanza. Le consta que allá por el 1921 el gobierno mensuró los manglares. Fué Morales. El testigo lo llevó allí. Preguntado: "Usted sabe si antes de proceder a la mensura hizo alguna gestión con respecto a los colindantes?", contestó: "Sí, señor, el ingeniero fué personalmente conmigo y notificó a los colindantes de los manglares oficialmente, los que le dieron su aceptación. —¿Entre ellos a quiénes recuerda usted?—Yo recuerdo los señores Zalduondo, la Sucesión Veve de Fajardo.—Y a quién vieron de la Fajardo Sugar?—Vimos a don Jorge, pero entonces don Jorge recomendó al ingeniero que fuera donde el abogado de la Central, para ciertas cuestiones, que es el señor Sifre, que vive en San Juan, y entonces yo no pude acompañarlo.—¿Usted sabe si el señor Morales fué molestado durante el tiempo que usted estuvo allí?—En ningún momento, fueron muy corteses con él todos los empleados.''

La mensura se hizo públicamente, de día, a la vista de los colindantes. El corte de los mangles se verifica científicamente. Han cortado en los de la Esperanza. Sólo se cortan los árboles que han llegado a su madurez y que si no se cortaran se dañarían. Se defiende la vegetación nueva. Varias veces fué molestado por empleados de la demandante, un par

de peones, a quienes denunció. Está en posesión de los manglares. Los protege inspeccionándolos semanalmente.

Repreguntado por el abogado de la demandante, contestó, en parte, como sigue:

"¿Usted dice que cuando fueron a hacer las mensuras notificaron a los colindantes?—Sí, señor.—¿Y qué notificaron a Zalduondo y Veve y a la Fajardo Sugar?—Y a otros colindantes.—¿Esos colindantes que usted ha dicho son los colindantes de la finca Esperanza?—No todos, algunos de ellos.—¿Cuáles?—Pues los señores Behn Brothers, representados por el señor Mariano Alburúa. Y fué notificado Don Jorge Bird que es el representante de la Fajardo Sugar Growers Association, y la sucesión Cruz fué notificada también como colindante de esa parcela.—¿Es o no cierto que la Fajardo Sugar Growers por conducto de sus empleados ha cortado casi continuamente leña en esos manglares?—No, no es verdad; ha cortado algunas veces.—¿Y cuánto son algunas veces?—Pues que yo los haya sorprendido sólo un par de veces, y los han llevado a la Corte."

Llamado nuevamente por la demandante el Sr. McCormick aseguró que la demandante está en posesión de los manglares que corresponden a la finca Esperanza, volteándolos y cortando espeques, estantes y traviesas desde hace quince años que está allí.

Y vueltos a llamar entonces los Sres. Kramer y Flores por los demandados contestaron, Kramer, que al hacerse cargo de los manglares de la Esperanza los encontró en condiciones excelentes. Si se hubiera hecho algún corte lo hubiera advertido. Dijo textualmente: "Yo estoy dispuesto a declarar, que antes del mil novecientos veintitrés, ningún corte de importancia se había efectuado en los manglares de la Esperanza por el período de cinco años." Y Flores:

"¿En su carácter de guardabosques de los manglares de la Esperanza tuvo usted alguna negociación con la Fajardo Sugar Growers Association?—Sí, señor.—¿En qué fecha?—A fines del año mil novecientos diez y nueve, en el veinte hasta el veintiuno.—¿Con respecto a esos manglares de la Esperanza qué negociación tuvo usted con la Esperanza en su carácter de guardabosque con la Fajardo Sugar Growers Association?—De acuerdo con una autorización, o con un

contrato que tenía la Fajardo Sugar Growers Association con el Servicio Forestal de Puerto Rico, yo he vendido la madera de espeques mensualmente para la colonia Esperanza y Oriente.—¿De qué manglares?—Del manglar de la Esperanza.—¿Ellos sabían que esa madera era de esos manglares?—Sí, señor.—¿Quiénes venían a buscar esos mangles?—Los carros de la Colonia Esperanza.—¿Y en qué finca se desmontaban?—En el mismo manglar Esperanza.—¿Qué personas tomaban esos manglares?—Los peones y los carreteros de la compañía—¿Y a algunos mayordomos los vió usted por allí?—Sí, los mayordomos venían a recibir el material para entregarlo a sus peones.—¿Los mayordomos de la misma finca Esperanza?—Sí, señor.''

Repreguntado por el abogado de la demandante contestó:

''¿Usted vió ese contrato de venta que tenía el Servicio Forestal con la Fajardo Sugar Growers Association?—Los contratos están en la oficina del Servicio Forestal, y de la Fajardo; pero yo tenía la orden para despacharlos y yo cogía recibos de los mayordomos, y entonces iba mensualmente a la oficina de la Fajardo Sugar a cobrar el importe de los espeques que vendía.—¿Y esos mangles de dónde los sacaba?—El contrato era para distintas parcelas, quedaban o se cortaban en Esperanza, en Mont Ida, en Boca del Daguao, en Fortuna, Mata Redonda, en Santa Rita; en todas esas partes tenía yo que despachar los cortes.—¿Quiénes hacían los cortes?—Los peones de la Fajardo Sugar Company, y los mayordomos recibían el material. Yo cobraba el canon del Gobierno, lo que le imponía el gobierno a la Fajardo Sugar como derechos de corte.''

Así terminó la práctica de la prueba. La de ambas partes demuestra que las noventa y una cuerdas de manglares en cuestión fueron concedidas al causante de la demandante en el año de 1869 quedando la concesión inscrita a su instancia en el Registro desde 1880 sin que hasta la fecha se haya cancelado la inscripción; que la inscripción se verificó haciendo referencia específica a la concesión; que ésta lo fué bajo la condición indispensable de la revocación de la gracia y reversión del terreno al Estado si en el preciso término de un año no se tenía cultivada la décima parte, en el de cuatro la cuarta y en el de diez la mitad a beneficio de la agricultura, y que el concesionario no cumplió la condición a su tiempo ni después, ya que los manglares siguen siendo manglares

todavía, esto es, tierras donde crece el mangle bañadas por el mar constantemente o en el flujo de sus mareas. *El Pueblo* v. *Dimas*, 18 D.P.R. 1061, 1071.

Tiende además a demostrar la prueba de los demandados que en diciembre 3, 1878, el gobierno se incautó de los manglares cedidos condicionalmente por no haberse cumplido por el concesionario la condición y está en posesión de ellos desde entonces, habiéndolos mensurado de nuevo con conocimiento y sin oposición de la demandante allá por el año de 1921 y habiéndolos explotado sin más obstáculos que algunas intromisiones de la demandante que tuvieron lugar no mucho antes de la interposición de su demanda, después de haber contratado con el Pueblo sobre la compra de maderas de los manglares del mismo entre otros del propio manglar de la Esperanza.

Bajo esas circunstancias, no creemos que actuara desacertadamente la Corte de Distrito al negarse a librar la orden de *injunction* preliminar que la demandante le pidiera.

Al discutirse este caso en el seno del tribunal surgió la cuestión de si era o no aplicable al mismo la decisión de la Corte de Circuito de Apelaciones del Primer Circuito en el de *People of Porto Rico* v. *Livingston,* 47 F. (2d) 712.

Hemos leído cuidadosamente tanto la opinión de la mayoría emitida en dicho caso por el Juez Sr. Wilson como la de la minoría emitida por el Juez Sr. Anderson y a nuestro juicio aunque pueden advertirse varios puntos de contacto, los principios que se sientan en la opinión de la mayoría no son aquí decisivos en el sentido de dar a la sola inscripción del título de la demandante tal virtualidad que deba considerársele que establece de modo indiscutible y definitivo su derecho a los manglares de que se trata.

También hemos estudiado la decisión de esta Corte en el caso de *El Pueblo* v. *Riera,* 27 D.P.R. 1, en que en gran parte descansa la de la mayoría de la Corte de Circuito en el de Livingston, supra, a los efectos de la interpretación de los preceptos de la Ley Hipotecaria envueltos, y tampoco

creemos que a virtud de su autoridad deban necesariamente declararse sin lugar las pretensiones de los demandados en este procedimiento y fallarse el mismo en pro de la demandante, especialmente cuando el examen actual que de dicho caso hemos hecho nos lleva a dudar de si a virtud de las constancias del propio registro y de la naturaleza de los terrenos envueltos Riera era en verdad un tercero desconocedor de los vicios del título de su causante.

De todos modos la cuestión aquí envuelta debe juzgarse y decidirse por sus propios méritos y atendida la naturaleza del procedimiento en que ha sido levantada. Los casos contra Livingston, supra, y Riera, supra, fueron pleitos de reivindicación iniciados por El Pueblo no sólo contra demandados que tenían sus títulos inscritos en el Registro, si que estaban en posesión y disfrute de las tierras en cuestión. Y éste es un caso de *injunction* preliminar en el que se ha alegado—y presentado fuerte prueba para sostener la alegación—que desde antes de la inscripción perdió el causante de la demandante la posesión de los manglares y que la demandante por sí misma jamás la ha tenido y ha realizado por el contrario actos que implican la negación de su propio derecho tal como ahora lo reclama.

De la certificación expedida por el Registrador de la Propiedad de Humacao presentada por la propia parte demandante en evidencia aparece que la primera inscripción de la hacienda Esperanza que se describe, como ''compuesta de mil cincuenta y nueve cuerdas con noventa y cuatro centavos más o menos, . . . de terreno llano, de altura y manglares,'' se verificó el 29 de mayo de 1880 a favor de don Guillermo Noble, a virtud de lo hecho constar por él mismo en una escritura declaratoria otorgada en abril anterior. Noble compareció ante notario y proporcionándole las indicaciones, antecedentes y documentos que se estimaron necesarios, agrupó en una diversas fincas y así agrupadas las inscribió en el registro. Al llegar a lo pertinente a este caso, dice la inscripción:

". . . y noventa y una cuerdas sesenta y cuatro centavos procedentes de terrenos baldíos, según título expedido por el Excelentísimo Señor Presidente de la Junta Superior de terrenos baldíos el veinte y ocho de junio de mil ochocientos sesenta y nueve. Estas porciones de tierra reseñadas le corresponden a Don Guillermo Noble y Látimer por los títulos y conceptos expresados; todo lo que acredita ante el Notario autorizante de la escritura con las matrices de dichas escrituras, obrantes en los protocolos de Naguabo y con los originales de las diligencias y título de la Junta Superior de terrenos baldíos referidos que dicho Notario tiene a la vista en el acto del otorgamiento de la escritura."

Se recordará que según la prueba de los demandados, no habiendo el Sr. Noble cumplido con la ineludible condición de cultivo que se le impuso, el Estado se incautó con anterioridad al 1880 de los manglares que le concediera, de suerte que cuando en ese año el Sr. Noble a virtud de su propia declaración inscribió la concesión, ya ésta no tenía eficacia ni en sí misma ni en la realidad de los hechos, pues Noble había perdido la posesión que se le diera en 1869.

No creemos que pueda sostenerse por nadie que Noble, a virtud de la inscripción, si los hechos son como se indican, hubiera podido adquirir algo para sí.

Pero se sostiene que la Ley Hipotecaria es una ley de terceros y que aquéllos que adquirieron de Noble que aparecía como dueño del registro, obtuvieron un título indiscutible a la propiedad de la parcela en cuestión.

Veamos lo que expresamente disponen los artículos 33 y 34 de la Ley Hipotecaria. Dicen:

"Art. 33. La inscripción no convalida los actos o contratos que sean nulos con arreglo a las leyes.

"Art. 34. No obstante lo declarado en el artículo anterior, los actos o contratos que se ejecuten u otorguen por persona que en el Registro aparezca con derecho para ello no se invalidarán en cuanto a tercero, una vez inscritos, aunque después se anule o resuelva el derecho del otorgante en virtud de título anterior no inscrito o de causas que no resulten claramente del mismo Registro.

"Solamente en virtud de un título inscrito podrá invalidarse, en

perjuicio de tercero, otro título posterior también inscrito, salvo lo dispuesto en el art. 389.

"Lo dispuesto en este artículo no será aplicable en ningún tiempo al título inscrito con arreglo a lo prevenido en el art. 390, a menos que la prescripción haya convalidado y asegurado el derecho a que se refiera dicho título."

¿Consta inscrito el título del Pueblo en el Registro? ¿Fueron los terceros adquirentes informados claramente por el registro de que Noble no había cumplido la condición de cultivo imprescindible para la adquisición de un título perfecto?

A nuestro juicio para que quedara inscrito en el Registro un derecho eficaz a favor de Noble, debió haberse hecho constar el cumplimiento por su parte de la condición. Las concesiones se hacían de acuerdo con leyes y reglamentos en vigor que formaban parte de las mismas, siendo por tanto conocidas no sólo por Noble si que también necesariamente por los ulteriores adquirentes. Estos no pueden alegar que no fueron informados y en tal virtud el no cumplimiento les perjudica lo mismo que a Noble. Además el título del Estado quedó prácticamente inscrito en el Registro al Noble inscribir en él la concesión. Y es a virtud de ese título anterior inscrito que alegaron los demandados que estaba el Pueblo poseyendo en la actualidad los manglares en disputa. Ese título de acuerdo con la propia ley, si prevalece, puede perjudicar a terceros.

Pero aunque no fuera ello así, siempre nos encontraríamos con que el Estado readquirió la posesión de los manglares y la conserva desde antes de la primitiva inscripción, no viniendo obligado a inscribir su derecho por tratarse de bienes que le corresponden a virtud del dominio eminente de que está investido; con que Noble inscribió pero no poseía lo inscrito, y con que habiendo la demandante adquirido el título que invoca desde 1909, esto es, desde hace más de 20 años, tampoco entró en la posesión de los manglares. El Registro de la Propiedad no se ha hecho para llevar a él derechos

que no existen. Es cierto que protege a los terceros, pero parte siempre de la base de que existe algo real. Y aquí lo único real que existía eran los propios manglares que hablando por sí mismos dijeron desde un principio a la demandante que no podía adquirirlos porque la concesión que se hiciera a su causante había quedado sin efecto. En un caso menos fuerte que el presente esta corte consideró predominante el hecho de la posesión de los demandados como dueños por más de 30 años, no obstante encontrarse inscrito en el Registro el título del demandante, y resolvió el pleito en su favor. Nos referimos al caso de *Pesquera* v. *Fernández*, 22 D.P.R. 53.

En resumen, los hechos tales como surgen de la prueba de los demandados, son:

El Estado, dueño de unos manglares los cedió a un particular en 1869 bajo la ineludible condición de cultivarlos dentro de períodos de tiempo especificados. No cumplida la condición, se incautó de ellos y entró de nuevo en su posesión material en la que ha permanecido desde entonces.

El concesionario, caducada ya la concesión y perdida la posesión material de los manglares, compareció ante un notario, le presentó el documento creditivo de la concesión junto con otros demostrativos de la adquisición de otras tierras colindantes entre sí y otorgó una escritura declaratoria de dominio que presentó en el registro e inscribió en 1880. Sin que llegara jamás a readquirirse la posesión material de los manglares, vendióse la finca a diferentes personas, quienes tampoco entraron jamás en la posesión material de los manglares incluídos dentro de la descripción de la finca. Y ahora, después de cincuenta años de haber el primitivo dueño readquirido la posesión y continuar en ella, al encontrarse el dueño de la antigua finca agrupada que en el Registro aparecen formando parte de ella todavía los manglares en cuestión, los reclama.

*A virtud de esos hechos no es posible dictar otra resolución que no sea la de confirmar la de la corte de distrito por*

*virtud de la cual se negó a expedir el* injunction *preliminar que contra los demandados solicitara la demandante.*

Los Jueces Asociados Señores Wolf y Aldrey disintieron.*